Hart, J.
There has been submitted to me for approval a certificate for the incorporation of the ‘' Committee for the Preservation of the Constitutional Right to Trial by Jury, Inc. ’ ’.
In view of the historic background of the jury system and the fact that the right to a trial by jury in a civil case is guaranteed by the Constitution of the United States and the Constitution of every State of the Union except Louisiana and Utah, the necessity for the organization of a committee such as this might be questioned.
Clouds on the Horizon of Democracy
During the past five years, however, proposals have been advanced that trial by jury be denied in actions brought to recover damages for personal injuries.
These proposals have received widespread publicity, probably due to the fact that they have been advanced by high-ranking members of the judicial system, which have culminated in the introduction in the State Senate of a resolution to amend the Constitution so as to abolish the right to trial by jury in personal injury actions. (Concurrent Resolution of Senate and Assembly [1956], Print No. 48, Int. No. 48.)
Numerous addresses have been made upon this subject by Presiding Justice David W. Peck of the Appellate Division, First Department. A short time ago, while appearing on Station WMCA, referring to the verdicts of juries, he said: “ I have no complaints about jury trials or the result of jury trials. The only thing about it is that the process of jury trial is so slow that you can’t keep up with the rapidity of accidents in a congested community like New York City, and therefore you are presented with the problem of either changing the process of trial to get one which is more speedy or having a lot more court buildings, judges, and jurors around to try cases.”
Supreme Court Justice Samuel H. Hofstadter (1st Dept.) in an article in the New York Times (Feb. 21,1954), is reported to have said: “ By a bare majority the trial justices of the First Department last May (1953) registered their approval of a move to abolish jury trials in civil actions, with some exceptions, as under the English system.”
*550 United States Court of Appeals Judge Jerome N. Frank, in an article in Collier’s Magazine (Dec. 9, 1950), said: “ Since in none of the democracies other than ours today is the jury held in high esteem, it cannot be considered an essential part of democratic government ” (emphasis supplied).
One might be tempted to ask, where are the democracies ‘ ‘ other than ours ’ ’ ?, and then cite the highly relevant comment made approximately two hundred and sixty years ago by one of the Justices of His Majesty’s Court of Common Pleas, Sir William: Blackstone, Knt., viz.: “ And, therefore, a celebrated French writer, [Montesq. Sp. L. xi, 6] who concludes, that because Rome, Sparta and Carthage have lost their liberties, therefore those of England in time must perish, should have recollected that Rome, Sparta and Carthage, at the time when their liberties were lost, were strangers to the trial by jury ” (emphasis supplied).[1]
Are Awards of Juries and Judges the Same?
In the New York State Bar Bulletin of April, 1953 (p. 117), Presiding Justice Peck states: “ Over all, there is no reason to think that results before judges would be any different from those before juries, although a more even and less spasmodic justice could be anticipated. In the one State where I know that comparisons can be made, the State of Massachusetts, where they have two courts of coordinate jurisdiction, one trying cases with juries and the other without, with no distinction in the class of cases or the monetary jurisdiction of the two courts, the figures show that the percentage of plaintiff’s and defendant’s verdicts is the same and the amounts of the awards are the same. ’ ’
On the other hand, we find Chief Justice Arthur T. Vanderbilt, of the Supreme Court of the State of New Jersey, quoting Chief Justice Stern, of the Common Pleas Court of Pennsylvania, as having used the following language with respect to the disposition of actions without a jury:[2] “ The plaintiffs expressed satisfaction because they were getting a prompt hearing of their cases with resulting prompt payments * * * On the other hand, the defendants were equally pleased because they felt protected from the danger of reckless and extravagant verdicts and were satisfied that the amounts found were fair and reasonable.” (Emphasis supplied.)
*551 Associate Justice Boteust of the Appellate Division, in his admirable book Trial Judge, states (p. 142): “A case was tried before me involving the death of a man in his thirties, who was survived by a widow and three small children. For some reason, the lawyer representing his estate did not demand a jury ” (emphasis supplied).
Mr. Justice Boteih then goes on to discuss the facts, as found by him, as follows: “ the defendant was driving his car at an excessive rate of speed, that he had passed another car dangerously close to a curve, and that as he entered the curve his left wheels were on the wrong side of the white line bisecting the road. His car collided with that being driven by the decedent, in the opposite direction. The latter suffered internal injuries which resulted in his death in a hospital two days later. Unquestionably, the defendant had operated his automobile negligently. ** * * that the decedent had been to a bachelor party * * * He had a few drinks * * * that he too was straddling the white line. The conclusion was inescapable that the decedent had been as much to blame as the defendant ”.
Mr. Justice Botein then concludes (p. 143): “ Under the circumstances I had no alternative but to decide in favor of the defendant. Had I found in favor of the plaintiff, who was the widow acting as administratrix, I would have given her a verdict of sixty thousand to seventy thousand dollars. It was no comfort to me to feel that a jury might have found in her favor or given her half that amount as a compromise verdict. Rendering a decision for the defendant was a distressing judicial duty.” (Emphasis supplied.)
The sole basis for the decision in the above case was the determination by Mr. Justice Botein that the witnesses who testified that the deceased ‘ ‘ was straddling the white line ” were telling the truth . While any other judge might have come to the same or a different conclusion from the same state of facts, the necessity for performing such “ a distressing judicial duty” could have been obviated if it were not for the fact, as Mr. Justice Botein says, “For some reason the lawyer representing his estate did not demand a jury.”[3] At any rate, it is apparent from the language of this learned Associate Justice of the Appellate Division, that he is not in accord with the view expressed by the Presiding Justice, that “ Over all, there is no reason to think that results before judges would be any different from those before juries. ’,[4]
*552 The Function of a Jury
The principal function of a jury is to evaluate the credibility of the witnesses who testify before it, and attempt to come to a conclusion as to which witnesses are telling the truth, and render its verdict on that basis in accordance with the instructions from the court. Neither the jurors, in rendering their verdict, nor the judge in a case tried without a jury, in rendering his decision, pretends to know what actually happened at the time of the incident upon which the cause of action is predicated.
Presiding Justice Peck recently stated: “ On the civil side, where you are talking about whether the light was red or green, whether the car was on the wrong side of the road, how fast it was going, and those questions, I think that a judge without a jury can handle the situation as well as a jury ”.[5]
I repeat that no judge or jury knows whether a ‘ light was red or green,” or whether “ a car was on the wrong side of the road, or how fast it was going. ’ ’ As hereinbefore stated, they can but listen to the testimony of the witnesses and decide the case on the basis of credibility, which I shall hereinafter demonstrate, by quotation from competent authority, can be more efficiently done by twelve citizens called from every walk of life than by the most competent and experienced judge.
Reasons Assigned for Denial of Jury Trial
It will be noted that no one has made an attack on the jury system upon the ground that it does not promote the interests of justice. The abolition of trial by jury is urged upon the ground that such a trial takes longer than one without a jury, and, therefore, causes congestion of the calendars in our courts. It has been said that in order to continue the jury system it will be necessary to increase the number of judges, and may even necessitate the erection of new courthouses, all of which will entail great expense.
It has been stated that jury trials belong to the horse and buggy age and that the advent of the motor vehicle and the resultant personal injury claims incidental to the operation of automobiles in our city streets have resulted in an increase in litigation to the extent that the calendars of our courts are congested.
The history of this State demonstrates the falsity of the contention that calendar congestion in the Supreme Court is due to the advent of the automobile. As far back as 1828 Governor *553 DeWitt Clinton, and in 1834 Governor William L. Marcy, commenting on the judicial system, said it needed to be enlarged ‘ to meet the demands of accumulated business and to prevent delays which amounted to a denial of justice.” This message was repeated by Governor Marcy in 1835,1836 and in 1837, at which time he recommended an enlargement of the Supreme Court. ’ ’ The Legislature apparently found it inconvenient or impracticable to give the subject the attention it deserved but appointed a commission to investigate the circumstances. In 1839 Governor William F. Seward, in his annual message to the Legislature, stated, “ Every other vice of government is more endurable than delay in the administration of justice.” Governor William C. Bouck in 1843 urged that the Legislature make “ adequate provision for the expansion of the judicial system with the increased population and business of the state.”
The situation is ably summed up by Charles Z. Lincoln, who in his work entitled, Constitutional History of New York, says: “ The Bench and the Bar and the people generally were studying the subject, and numerous plans of greater or less merit were brought to public attention. It was conceded that the situation demanded relief, but great diversity of opinion was manifest from the failure to repass many amendments, and from the failure to repass amendments which had been agreed upon by a previous Legislature. The result was that no progress was made except in the presentation and comparison of plans and a general and continued discussion of the whole subject.”
It is apparent from the foregoing that congestion has existed in our Supreme Court for upwards of 125 years, due solely to the fact that the Legislature has failed to recognize that with the growth of population, industrial expansion and devices created by inventive genius, additional judicial manpower was not only necessary but, as heretofore pointed out, was recommended by practically every Governor since DeWitt Clinton in 1828 and by almost a score of committees and commissions on the judiciary appointed during that period.
In 1894, after the consolidation of the various courts with the Supreme Court, there were 76 Justices of the Supreme Court in this State which then had a population of less than 6,000,000 people (one judge for each 80,000 population). At that -time there were no personal injury actions resulting from automobile accidents. In fact, there were no automobiles. In 1956 we have 132 Justices in New York State with a population of approximately 17,000,000 or one for each 128,785 population and in the Second Judicial District we have approximately one Justice of the Supreme Court for each 160,000 population.
*554 I have studied the judicial history of the State and carefully examined the minutes of the various constitutional conventions, and although I found that on several occasions proposals were advanced in favor of changing the provision for a unanimous jury verdict, I could not find a single word spoken by any delegate or person in authority in support of a proposition that the right to a trial by jury be denied in any case where it had theretofore existed.
Witnesses Called in Defense of the Jury System
It might not be considered appropriate, and it might even be immodest, if I were to take issue with the illustrious jurists who have argued in favor of the abolition of trial by jury in personal injury cases. So I will call as witnesses historic and revered members of the Bench and Bar.
Sir William Blackstoxe.[6] “ Upon these accounts the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And, if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases! * * * it is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals. A constitution, that I may venture to affirm has, under providence, secured the just liberties of this nation for a long succession of ages.”
Jurors Better Qualified to Find Facts
As to the question as to whether a jury or a judge is better qualified to find facts, Blackstoxe stated (p. 379):
“ It is wisely therefore ordered, that the principles and axioms of law, which are general propositions, flowing from abstracted reason, and not accommodated to times or to men, should be deposited in the breasts of the judges, to be occasionally applied to such facts as come properly ascertained before them. For here partiality can have little scope: the law is well known, and is the same for all ranks and degrees; it follows as a regular conclusion from the premises of fact pre-established.
“ But in settling and adjusting a question of fact, when intrusted to any single magistrate, partiality and injustice have an ample field to range in; * * *. Here therefore a competent number of sensible and upright jurymen, chosen by lot *555 from among those of the middle rank, will be found the best investigators of truth, and the surest guardians of public justice. For the most powerful individual in the state will be cautious of committing any flagrant invasion of another’s right, when he knows that the fact of his oppression must be examined and decided by twelve indifferent men, not appointed till the hour of trial; and that, when once the fact is ascertained, the law must of course redress it.” (Emphasis supplied.)
As to the voice of the people in the judicial system, Blackstone observed (p. 379): “This therefore preserves in the hands of the people that share, which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens. ’ ’
With respect to the suggestion that the issues of fact in actions for personal injuries be disposed of by an administrative body or commission, the remarks of Justice Blackstone, though uttered in the Eighteenth Century, are prophetic, and the warning given by him should be given heed at the present time. He stated (pp. 379-380): “ Every new tribunal, erected for the decision of facts, without the intervention of a jury, (whether composed of justices of the peace, commissioners of the revenue, judges of a court of conscience, or any other standing magistrates) is a step towards establishing aristocracy, the most oppressive of absolute governments. * * * It is therefore upon the whole, a duty which every man owes to his country, his friends, his posterity, and himself, to maintain to the utmost of his power this valuable constitution in all its rights; to restore it to its ancient dignity, if at all impaired by the different value of property, or otherwise deviated from its first institution; to amend it, wherever it is defective; and, above all, to guard with the most jealous circumspection against the introduction of new and arbitrary methods of trial, which, under a variety of plausible pretences, may in time imperceptibly undermine this best preservative of English liberty.”
After noting the defects existing in the jury system even in those days, Blackstone continued (p. 385) : “I have ventured to mark these defects, that the just panegyric, which I have given on the trial by jury, might appear to be the result of sober reflection, and not of enthusiasm or prejudice. But should they, after all, continue unremedied and unsupplied, still (with all its imperfections) 1 trust that this mode of decision will be found the best criterion, for investigating the truth of facts, that was ever established in any country.” (Emphasis supplied.)
*556 Former Judge John F. Dillon
My next witness is former Judge John F. Dillon [7] of the Circuit Court of the United States for the 8th Judicial Circuit, and also Chief Justice of the Supreme Court of the State of Iowa, who was Storrs Professor at Yale University (1891-1892), who emphatically stated:[8] “ Consonant with the popular character of our institutions are the grand and petit jury. They are expressions of the free and practical spirit of the common law. They have a value, a deep value, too often overlooked, beyond the specific functions they exercise. The jurors acquire and disseminate a knowledge of the laws among the local communities from which they come, and to which they return. * * * I will # * reaffirm that in my judgment the jury is both a valuable and an essential part of our judicial and political system. It is not simply to be venerated as a reminiscence, hut to be prized for its usefulness. Its roots strike deep into the soil, and cling to the very foundation stones of our jurisprudence. The system belongs to free institutions, and tends to fortify and perpetuate them. * * * I protest against the continentalization of our law. I invoke the conservative judgment of the profession against the iconoclast who in the name of reform comes to destroy the jury; against the rash surgery which holds not a cautery to cure, hut a knife to amputate. Twelve good and lawful men are better judges of disputed facts than twelve learned judges.” (Emphasis supplied.)
Former Associate Justice Samuel F. Miller, United States Supreme Court
May I now call as a witness former Associate Justice Samuel F. Miller, of the United States Supreme Court:[9] “ And I must say that in my experience in the conference room of the Supreme Court of the United States, which consists of nine judges, I have been surprised to find how readily those judges come to an agreement upon questions of law, and how often they disagree in regard to questions of fact which apparently are as clear as the law. I have noticed this so often and so *557 much that I am willing to give the benefit of my observation on this subject to the public, that judges are not pre-eminently fitted over other men of good judgment in business affairs to decide upon mere questions of disputed fact. ’ ’
Associate Justice George Sutherland
Associate Justice George Sutherland of the Supreme Court of the United States stated the position of that court as follows :[10] ‘ ‘ Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.” (This was a civil case.)
Associate Justice Joseph Story
Justice Story of the United States Supreme Court, a most learned jurist, expressed himself as follows: [11] “ the Constitution would have been justly obnoxious if it had not confirmed it (right to trial by jury) in the most solemn terms.”
Personal views on the subject
If, after hearing what has been said or written by these illustrious jurists, anyone should happen to be slightly interested in my views, I will take the liberty of stating them as follows:
Not a single logical reason has been advanced for the proposal to discontinue the right to a trial by jury in personal injury actions. I do not believe that the citizens of our great State will ever sanction such action solely upon the theory that to retain such right will involve the expenditure of money.
One of the grievances against King George the Third in the Declaration of Independence was that he had deprived us “ in many cases of the benefits of trial by jury.” This precious heritage, secured for us at the price of the blood of our ancestors, should not be sacrificed on the altar of economy.
To argue to the contrary would be as illogical as to contend that the right of the citizens to vote should be curtailed because the increased population required new polling places and additional election officials.
I cannot agree that a jury trial, while important in a criminal action, is unnecessary in a civil action. I have witnessed, during my years at the Bench and Bar, the horrible tragedies that have *558 fallen upon plaintiffs in civil actions, and their families, where accidents have resulted in loss of life, limbs and eyesight. There have been carried into our court on stretchers, wheeled in on wheelchairs, walked in on crutches or artificial limbs, plaintiffs who claimed that their injuries were due to the negligence of a defendant. It certainly cannot be disputed that the impact of an unfavorable result would be far more drastic than a conviction would be to a defendant in the majority of cases where he stands accused of a crime.
No other example need be cited to emphasize the importance of a jury in a civil action than the one referred to by Mr. Justice Botein.[12]
I should like to see engraved over the portals of our new court house the immortal words: “ THE RIGHT TO TRIAL BY JURY AS HERETOFORE USED SHALL FOREVER REMAIN INVIOLATE.”
But should we fail our ancestors who gave their lives to preserve for us this precious right, should we permit it to be abridged and in time wither and die, as it descends in silence to the grave let no man write upon its tomb a single word. When the years have passed and the impact upon our democracy shall have been fully realized, if I do not greatly deceive myself, impartial posterity will inscribe an epitaph on that tomb, expressive of profound veneration.
Gentlemen, it is with a feeling of satisfaction that I sign this certificate of the Committee for the Preservation of the Right to Trial by Jury, Inc.

 Blackstone on Commentaries on The Laws of England, Book The Third [12th ed.], p. 378.

 Vanderbilt on Challenge of Law Reform, p. 95.

 Botein on Trial Judge, p. 142.

 New York State Bar Bulletin, April, 1953, p. 117.

 Address on Radio Station WMCA.

 Commentaries, p. 378.

 Judge Dillon was also Author of Commentaries on the Law of Municipal Corporations; Member L’Institut de Droit International; late Professor of Real Estate and Equity Jurisprudence in Columbia College Law School. (The lectures were published by Little, Brown and Company, 1894.)

 Lecture 5 pp. 166-168.

 Quotations from an article by Mr. Justice Sam P. Miller (U. S. Supreme Court), The System of Trial by Jury, 21 Amer. L. Rev., p. 863.

 Dimick v. Schiedt, 293 U. S. 474, 486.

 2 Story on Constitution, p. 1779.

 See n. 3 (supra).